No. 21-2925

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

### UNITED STATES OF AMERICA,

*Appellee,*

-v.-

### SHAWN BALDWIN

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION
Case No. 1:17 CR 00787
The Honorable Judge John Robert Blakey

### REPLY BRIEF FOR
### DEFENDANT-APPELLANT SHAWN BALDWIN

JENNIFER BONJEAN
BONJEAN LAW GROUP, PLLC
303 Van Brunt Street
Brooklyn, NY 11231
(718) 875-1850

<u>Chicago Office:</u>
BONJEAN LAW GROUP, PLLC
53 W. Jackson, Blvd. Ste. 315
Chicago Illinois 60604

*Attorney for Defendant-Appellant*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**................................................................... iii

<u>ARGUMENT</u>

I.  Tenuta's Deposition Was Taken in Violation of Fed. R. Crim. P. 15 and Its Introduction at Trial Violated Baldwin's Sixth Amendment Confrontation Guarantees.............................................................. 1

    A. As the District Court Acknowledged, the Defendant Made Timely and Specific Objections to the Government's Motion to Take and Admit Tenuta's Rule 15 Deposition............................ 1

    B. The Government Failed to Meet Its Burden Under Rule 15......... 8

        1. No Exceptional Circumstances.......................................... 8

        2. Failure to Comply with Rule 15(c)(3)................................ 11

    C. The Admission of Tenuta's Deposition Testimony Violated Baldwin's Sixth Amendment Confrontation Guarantees............. 13

    D. Defendant's Objections Are Preserved and Would Constitute Plain Error in Any Event.......................................................... 25

    E. The Error Was Not Harmless Beyond a Reasonable Doubt......... 26

II.  The Wire Fraud Counts of Baldwin's Indictment Were Not Properly Joined Pursuant to Fed. R. Crim. P. 8(a) and the District Court Abused Its Discretion When It Denied Baldwin's Motion to Sever Pursuant to Fed. R. Crim. P. 14.................................................... 27

III.  Baldwin Was Denied a Fair Trial Where the Court Allowed the Introduction of Excessive Other Bad Act That Constituted Impermissible Propensity Evidence and Should Have Been Excluded Under Fed. R. Evid. 403 In Any Event............................ 30

IV.  The Trial Court Erred When It Denied Defendant's Motion for a Mistrial on the Grounds that Agent Paniwozik Gave Unreliable and Misleading Financial Analysis.................................................... 32

V.     Defendant Is Entitled to a New Sentencing Hearing Where the
       District Court Miscalculated the Total Offense Level Based on
       Inflated Loss Amount...............................................................   33

**CONCLUSION**.......................................................................   33

**CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP
RULE 32(g) and CR 32(c)**...................................................   34

**CERTIFICATE OF SERVICE**................................................   35

# TABLE OF AUTHORITIES

**Cases**

*Coy v. Iowa,* 487 U.S. 1012 (1988) ............................................................ 26

*Crawford v. Washington,* 541 U.S. 36 (2004) ............................................ 15

*Del v. Van Arsdall,* 475 U.S. 673 (1986) .................................................... 26

*Horn v. Quarterman,* 508 F. 3d 306 (5th Cir. 2017) .................................. 16

*In re Letters of Request from Supreme Court,* 821 F. Supp. 204 (S.D.N.Y. 1993) ..... 13

*Johnson v. Zerbst,* 304 U.S. 458 (1938) ...................................................... 7

*Maryland v. Craig,* 497 U.S. 836 (1990) ..................................................... 15

*Mattox v. United States,* 156 U.S. 237 (1895) ........................................... 15

*United States v. Abu Ali,* 528 F. 3d 210 (4th Cir. 2008) ........................... 21

*United States v. Ali,* 2010 U.S. Dist. LEXIS 164208 (W.D. Tenn. 2010) ................. 10

*United States v. Benefield,* 593 F. 2d 815 (8th Cir. 1979) ......................... 13

*United States v. Bordeaux,* 400 F. 3d 548 (8th Cir. 2005) ......................... 17

*United States v. Burden,* 934 F. 3d 675 (D.C. Cir. 2019) ........................... 14

*United States v. Cannon,* 539 F. 3d 601 (7th Cir. 2008) ............................ 16

*United States v. Carter,* 907 F. 3d 1199 (9th Cir. 2018) ............................ 26

*United States v. Chanu,* 40 F. 4th 528 (7th Cir. 2022) ............................... 30

*United States v. Cooper,* 243 F. 3d 411 (7th Cir. 2001) .............................. 7

*United States v. Drogoul,* 1 F. 3d 1546 (11th Cir. 1993) ........................... 10

*United States v. Groos,* 616 F. Supp. 2d 777 (N.D. Ill. 2008) ................... 10

*United States v. Hamilton,* 107 F. 3d 499 (7th Cir. 1997) ......................... 16

*United States v. McGowan,* 590 F. 3d 446 (7th Cir. 2009) .......................................... 16

*United States v. O'Brien,* 953 F. 3d 449 (7th Cir. 2020) ............................................ 27

*United States v. Olano,* 507 U.S. 725 (1993) .......................................................... 25

*United States v. Ousley,* 698 F. 3d 972 (7th Cir. 2012) .............................................. 1

*United States v. Prieto,* 812 F. 3d 6 (1st Cir. 2016) ................................................ 28

*United States v. Sandoval,* 1997 U.S. Dist. LEXIS 13648 (N.D. Ill. 1997) ................ 8

*United States v. Sanford,* 860 F. Supp. 2d 1 (D.D.C. 2012) ...................................... 9

*United States v. Sapse,* 2011 U.S. Dist. LEXIS 47507 (D. Nev. 2011) ..................... 17

*United States v. Sencen,* 2013 U.S. Dist. LEXIS 168705 (S.D. Ala. 2013) ............... 17

*United States v. Thomas,* 62 F. 3d 1332 (11th Cir. 1995) .......................................... 9

*United States v. Wag-Aero, Inc.,* 888 F. Supp. 101 (W.D. Ill. 1995) .......................... 17

*United States v. Wandahsega,* 924 F. 3d 868 (6th Cir. 2019) ................................... 16

*United States v. Warren,* 713 F. Supp. 2d 1 (D.C. Cir. 2010) ..................................... 8

*United States v. West,* 2010 U.S. Dist. LEXIS 85832 (N.D. Ill. 2010) ...................... 17

*United States v. Yates,* 438 F. 3d 13017 (11th Cir. 2006) .......................................... 18

*United States v. Yates,* 438 F. 3d 1307 (11th Cir. 2006) ............................................ 13

**Rules**

Fed. R. Crim. P. 8(a) .................................................................................................. 27

Fed. R. Crim. P. 14 .................................................................................................... 27

Fed. R. Crim. P. 15 ................................................................................................. 1, 2

Fed. R. Evid. 403 ....................................................................................................... 30

**ARGUMENT**

I.    **Tenuta's Deposition Was Taken in Violation of Fed. R. Crim. P. 15 and Its Introduction at Trial Violated Baldwin's Sixth Amendment Confrontation Guarantees.**

   A.    **As the District Court Acknowledged, the Defendant Made Timely and Specific Objections to the Government's Motion to Take and Admit Tenuta's Rule 15 Deposition.**

Desperate to persuade this Court that Defendant waived an objection to the taking and admission of Tenuta's Rule 15 deposition, the government either ignores or distorts the record, including express language of the District Court judge. The government generally claims that defense counsel failed to object to the government's claim that Tenuta was "unavailable" and then consented to the deposition that denied Defendant a face-to-face encounter. Not so. As the District Court judge acknowledged *more than once*, defense counsel's objections were timely and specific, and most importantly, put the government and the court on notice of the potential error and the grounds for the objection. (PTH (8/16/18) at 5;7 [Dkt. No. 43] PTH (8/21/18) at 12 [Dkt No. 46]; PTH (9/27/2018) at 17 [Dkt. No. 54]; PTH (1/14/2019 at 2-3) [Dkt No. 102]. *See United States v. Ousley,* 698 F. 3d 972, 975 (7th Cir. 2012) (holding that to preserve an issue for appellate review, a party must make a timely and specific objection, in order that he or she might alert the court and the opposing part as to the specific grounds for the objection).

On August 10, 2018, the government filed a motion entitled: "Government's Motion to Preserve and *Present* Trial Witness Testimony Through Deposition

Pursuant to Rule 15." [Dkt. No. 39] The government argued that Tenuta was an unavailable witness whose testimony should be presented to the jury by way of a deposition. Recognizing potential Sixth Amendment problems, the government opined that Defendant's Confrontation rights would be preserved because "Baldwin may be physically present at the deposition or he may choose to participate by videoconference." [Dkt. No 39 at 5] Citing Fed. R. Crim. P. 15(e)(3), the government assumed that the parties, including Defendant, would be present in-person to take Tenuta's deposition. [*Id.* at. 6] The motion stated that Defendant objects to the motion. [Dkt No. 39 at 7]

At a hearing on the motion, defense counsel objected at every turn, noting, "I just don't see anything exceptional about these circumstances." (Pretrial Hearing (8/16/18) at 4-5) She emphasized the potential Sixth Amendment violations to the Defendant who "has the right to have the jury observe this witness in his natural demeanor in the courtroom. I don't see anything exceptional about it." (*Id.* at 5)

Prosecutors responded, noting that the deposition would be in person in London with the parties present and posited that they could hook up to the courtroom so the Court could administer the oath "and then say goodbye and we could finish the deposition." (*Id.* at 7) After the judge expressed concern about prejudice to the Defendant, he offered to move the trial date to accommodate the witness's conflict. Defense counsel agreed to the continuance, and the court asked the government to work it out with the witness. (*Id.* at 11)

Four days later, the government filed a supplement to its Rule 15 motion. [Dkt. No. 45] The government casually informed the court that on August 17, 2018, Tenuta's counsel sent an email informing the government that Tenuta "definitively will not come to the US." The government offered no additional justification to demonstrate extraordinary circumstances, and the District Court asked for none. Prosecutors did not identify any other actions they took to secure Tenuta's in-person testimony.

On August 21, 2024, defense counsel continued to object to the Rule 15 motion *and* the admission of Tenuta's deposition. (PTH (8/21/18) at 4-5) Defense counsel repeated that: (1) no exceptional circumstances existed to justify the Rule 15 deposition *and* (2) that the admission of the deposition would run afoul of certain Sixth Amendment protections. No one in the courtroom misunderstood that defense counsel objected to the Rule 15 deposition and its admission on all grounds. Defense counsel expressly argued against the Rule 15 motion, distinguishing the government's leading authority in favor of the Rule 15 motion. Defense counsel pointed out that Tenuta simply did not want to come to court and argued that the government had failed to identify any exceptional circumstance that would justify taking the deposition required by Rule 15. (*Id.* at 4; 7-8)

Counsel further objected to the admission of the testimony absent a face-to-face encounter, stating:

> To allow the government to depose this witness, have him testify outside of the presence of the jury so that the jury is not in a position to be able to observe him one on one from the witness stand where is should be able to where he's not subject to the courtroom and also to

7

looking at your Honor, myself and *Mr. Baldwin,* we believe that it would be prejudicial for the deposition to go forward. (*Id.* at 5) (emphasis added)

Even when the court proposed that a video deposition could occur in the courtroom with the court administering the oath and ruling on objections contemporaneously, defense counsel noted that the court's proposed procedure would not protect Defendant's rights. (The court: "So in terms of him being in front of me or being able to – or the jury being able to observe his demeanor, that would happen through the video, wouldn't it?" Defense counsel: "not in the same way, Judge; no.") (*Id.* at 5-6) As the government concedes, the District Court judge expressly observed, "**[t]hey're [the Defense] objecting and preserving their arguments under Rule 15.**" (*Id.* at 12)

After the judge ruled that he was going to grant the Rule 15 motion, the prosecution asked, "[s]o you're contemplating that we would all be here with the victim in London or that we would all go to London and you're hooked up here?" (PTH (8/21/18) at 11) The District Court immediately and firmly ordered that the procedure would be as follows.

> The Court: Well, I'd love to go to London but that's now [sic] how it's going to work. So everyone is going to be here except the witness and you'd have the video monitor here. The court reporter could take it contemporaneous.

Understanding that the procedure did not comply with Rule 15 or Sixth Amendment mandates, the prosecutor attempted to gain the Defendant's consent to this procedure, stating "[i]f the defense is in agreement, I'm fine - -" The District Court cut him off making it clear as day that Defendant was *not* agreeing, stating,

"[w]ell, they're not in agreement. They're objecting and preserving their arguments under Rule 15."

The government disingenuously claims that Defendant affirmatively waived his right to a physical encounter with Tenuta, because defense counsel did not argue with the District Court judge *after* he ruled that no parties would be traveling to London and *after* he acknowledged that Defendant has preserved *all* of his Rule 15 objections. Indeed, it is difficult to imagine what else defense counsel could have done to preserve this issue for review other than argue with the judge. Federal Rule of Evidence 103(b) states that "[o]nce the court rules definitively on the record – either before or at trial – a party need not renew an objection or offer of proof to preserve a claim of error for appeal."

Before trial was scheduled to commence, Tenuta's deposition was adjourned because of Defendant's unexpected health issues. (PTH (9/27/2018) at 16) The prosecutor suggested that he could present Tenuta's testimony live from London during trial, that is, via a two-way closed-circuit procedure. Defense counsel *again* repeated that she generally objected to conducting his testimony in any manner other than live testimony in the courtroom. (*Id.*) The District Court observed that if Tenuta's testimony was presented through a live feed, it would not be a deposition. (*Id.*) Defense counsel again objected, pointing out that "I still think that there's some *confrontational issues but we've covered those*. . ." (*Id.* at 17)(emphasis added)

Counsel reiterated that Defendant was maintaining his objection to a procedure that did not involve a physical face-to-face encounter before the jury, but

understanding that those objections had been overruled, she would acquiesce to the procedure proposed by the government. When the prosecutor again sought to obtain Defendant's waiver of his Sixth Amendment rights, defense counsel stated again, "[w]e do object." (PTH (9/27/18) at 17)

And *yet again,* immediately before the deposition was scheduled to commence, defense counsel objected to the taking and use of Tenuta's deposition.

> Ms. Winslow: I just have one very short this just for the record. Your Honor has already ruled on this proceeding but just for the record – for the Appellate Record, if necessary – I would like to renew my objection to these proceedings. As contemplated, the government how has all the exhibits that the defense could use which means the government has essentially gotten our work produce or our thought process on this going forward. In addition, because of the technology in the way we're presenting this, should something else come up that we wish to use during our cross examination, we'll be prohibited from using it. I don't believe that any extraordinary –

The District Court judge interrupted counsel and ultimately stated "[y]our previous objection was already preserved for the record. The Court's finding remains the same" (PTH (1/14/2019) at 2-3)

Based on the record, there can be no question that defense counsel objected to the government's motion to conduct a Rule 15 deposition *on all grounds*. The record further reflects that Defendant objected to the *admission* of the deposition as violative of the Confrontation Clause where Defendant was denied a face-to-face encounter with the Defendant in the presence of the trier of fact.

The government relies on *United States v. Cooper,* 243 F. 3d 411, 418 (7th Cir. 2001) for the proposition that constitutional rights, including the right to Confrontation, can be waived. While this may be true, *Cooper* also notes that "courts indulge every reasonable presumption against waiver of fundamental constitutional rights and. . . . "do not presume acquiescence in the loss of fundamental rights." *Id citing Johnson v. Zerbst,* 304 U.S. 458, 464 (1938).

Here, the judge acknowledged multiple times that Defendant had preserved his objections to the government's motion seeking to take the Rule 15 deposition and admit it into evidence. There was nothing ambiguous about the objections which were rooted in the court's failure to comply with Rule 15 (*e.g.,* "I just don't see anything exceptional about these circumstances") and the Sixth Amendment Confrontation Clause (*e.g.,* "he's not subject to the courtroom and also to looking at your Honor, myself and *Mr. Baldwin*.")

Defense counsel did not waive or forfeit Mr. Baldwin's right to be present at the deposition simply because she did not argue with the District Court judge *after* he articulated the procedure that would be used and expressly precluded all parties from attending the deposition in person. Indeed, under Rule 15, the District Court judge should have advised Defendant that he could attend in person or obtain a written waiver from the Defendant. Even if Defendant somehow forfeited his right to be physically present at the deposition in London, he surely did not waive his objection to the admission of the deposition at trial.

In sum, defense counsel made affirmative invocations of Defendant's Sixth Amendment rights at every turn. The government *and* the District Court clearly understood that Defendant was objecting to the taking of Tenuta's deposition pursuant to Rule 15, the denial of his right to physically confront Tenuta, and its admission before the jury under the Sixth Amendment.

## B. The Government Failed to Meet Its Burden Under Rule 15.

As argued in his opening brief, Defendant contends that the District Court erred in granting the government's Rule 15 motion because: (1) no exceptional circumstances justified the Rule 15 deposition; and (2) the court failed to comply with Rule 15(c)(3).

### 1. No Exceptional Circumstances

The government contends that the court did not err when it granted the Rule 15 motion, because Tenuta was outside the jurisdiction of the court and his lawyer represented in an email that he would not appear. The mere fact that Tenuta was outside the jurisdiction of the court does not satisfy the "exceptional circumstances" required by Rule 15(a)(1). The government must do more. The District Court in *Sandoval* rejected an *ipso facto* finding of "exceptional circumstances" where a witness is outside the reach of the court's subpoena power. *United States v. Sandoval,* 1997 U.S. Dist. LEXIS 13648, *3-5 (N.D. Ill. 1997). *See also, United States v. Warren,* 713 F. Supp. 2d 1, 4 (D.C. Cir. 2010) ("a witness who resides abroad and outside the reach of a court's subpoena power is not automatically "unavailable" for Rule 15 purposes). As the court in *United States v. Sanford,* 860 F.

Supp. 2d 1, 4 (D.D.C. 2012) observed "unavailability is to be determined according to the practical standard of whether under the circumstances the [party seeking to take the deposition] has made a good-faith effort to produce the person to testify at trial." Not for nothing, Rule 15 does not express that unavailability is established when a witness is outside the subpoena power of the court. The absence of such language lends support to Defendant's position that simply because a witness resides in a foreign territory is not sufficient to justice a Rule 15 deposition.

District Court decisions throughout the country demonstrate that trial judges are obligated to conduct an appropriate and meaningful hearing to determine whether a party seeking a Rule 15 deposition can satisfy its burden. By way of example, the Eleventh Circuit makes clear that the government bears the burden of showing that exceptional circumstances existed to warrant the deposition. *United States v. Thomas,* 62 F. 3d 1332, 1340 (11th Cir. 1995). In evaluating whether the government has met its burden, the District Court is required to consider whether (1) the witness is unavailable; (2) injustice will otherwise result without the material testimony that the deposition could provide; and (3) countervailing factors would make the deposition unjust to the nonmoving party. *Id.* at 1341.

The District Court in this case did virtually nothing to determine whether the government had met its Rule 15 burden. The court disregarded the fundamental principle that the use of depositions is disfavored in criminal cases and that only under limited and exceptional circumstances should they be used. *See, e.g., United States v. Sandoval,* 1997 U.S. Dist. LEXIS 11467, *1 (N.D. Ill. 1997); *United States*

*v. Groos,* 616 F. Supp. 2d 777, 790 (N.D. Ill. 2008); *United States v. Drogoul,* 1 F. 3d 1546, 1551 (11th Cir. 1993); *United States v. Ali,* 2010 U.S. Dist. LEXIS 164208, *7-8 (W.D. Tenn. 2010). Foreign depositions are especially disfavored because of the absence of procedural protections afforded parties in the United States. *Sandoval,* 1997 U.S. Dist. LEXIS 11467, *1. *See also, Ali,* 2010 U.S. Dist. LEXIS 164208 at *8. For example, a court's inability to administer an oath that has any force renders foreign deposition testimony inherently unreliable. As even the prosecutor in this case acknowledged, it would have no way of charging or prosecuting Tenuta for perjury. (PTH (8/16/18) at 7)

With these principles in mind, the District Court was obligated to conduct a meaningful inquiry into whether this was an extraordinary case that allowed a Rule 15 *foreign* deposition. That the government might have faced challenges in proving two counts of the indictment without Tenuta's deposition testimony does not make the case an extraordinary one. Notably, the judge understood that it could not make an unavailability finding simply because Tenuta preferred not to come to Chicago to testify. (PTH (8/16/18) at 8). At the initial hearing where the government pointed to Tenuta's mother's surgery as the basis for his unavailability, the District Court stated:

> Obviously I could possibly find exceptional circumstances with respect to the need of a witness to take care of his mother after surgery. *I don't see exceptional circumstances on he just doesn't want to come to Chicago."* (*Id.*)

Despite his correct take on the law, the judge later did exactly what he acknowledged he could not do. He granted the motion based on a conclusory

statement in an email communicated by Tenuta's attorney, stating that Tenuta "definitively will not come to the US."

Minimally, the District Court should have ordered a remote hearing so that Tenuta and his counsel could appear and so that the court could assess whether Tenuta was truly unavailable and unwilling to give testimony or whether Tenuta might be willing to appear under some acceptable set of circumstances. A hearing to inquire directly from Tenuta and/or his counsel was particularly important, because Tenuta was not a hostile witness, had previously indicated that he would appear, and because his excuses for not appearing shifted over time. These evolving excuses also casted doubt on the *reliability* of Tenuta's testimony, a factor in deciding the admissibility of the deposition.

The District Court erred when it assumed unavailability on nothing more than a hearsay representation that the witness would not appear. If a one-line sentence from an attorney declaring that a witness will not appear is all that is required to satisfy the extraordinary circumstances sufficient to permit a deposition of a complaining witness in a criminal case, the exceptional circumstance rule is virtually meaningless.

### 2.     Failure to Comply with Rule 15(c)(3)

The government contends that Defendant waived his right to be physically present at Tenuta's deposition and that the District Court had no obligation to comply with Rule 15(c)(3) because Defendant did not affirmatively seek to be present in London for the deposition. As discussed, *supra,* the Defendant preserved

all objections under Rule 15, including his right to be physically present at the deposition. As the record reflects, when the prosecutor suggested that the parties would be present for the deposition, the court immediately nixed the idea, explaining that no parties would be traveling to London. When the prosecution sought to gain Defendant's consent *not* to be present at the deposition, the District Court cut him off announcing that Defendant was not consenting and had preserved his objection for appellate review. (PTH (8/21/18) at 11-12)

The government argues that the District Court was not obligated to follow Rule 15(c)(3) because Defendant did not demand to be present in London for the deposition after the court ruled. Not only was the objection preserved, but the District Court was arguably required to inform Defendant of his right to be present and obtain a written waiver of that right pursuant to Rule 15(c)(1). Admittedly, Rule 15(c)(1) only references in-custody defendants, but it makes little sense that a written waiver would only be required as to defendants in-custody, particularly where Defendant would have no ability to travel to London without the court's consent. After all, Defendant forfeited his passport as part of his bail conditions and would have no ability to travel to a foreign country without court approval.

Written waivers aside, Rule 15(c)(3) prescribes the procedure for the "Taking of Depositions Outside the United States Without the Defendant's Presence." After the District Court ruled that the parties, including the Defendant, would not be permitted to physically attend the deposition, it had an obligation to comply with Rule 15(c)(3) and make case-specific findings articulated in Rule 15(c)(3)(A-E).

As the government concedes, the court gave no explanation or case-specific rationale for why it ordered that none of the parties could be present in London for the deposition. Moreover, the rule would suggest that there were no obstacles to the parties, including the Defendant, appearing in person in London to take the deposition. The Defendant was not in custody; the U.K. would have allowed Defendant to attend; and there was no reason to believe that Defendant would not appear for the deposition or return to the United States for trial where he lived and where his wife and children resided.

Compliance with Rule 15(c)(3)(1) was not discretionary where the authority throughout the country is that Rule 15 ensures the right of the defendant to be present at the taking of the deposition. *See, United States v. Yates,* 438 F. 3d 1307, 1317 (11th Cir. 2006); *United States v. Benefield,* 593 F. 2d 815, 820 (8th Cir. 1979). Compliance with Rule 15 does not guarantee admission of the deposition testimony, but *failure* to permit the Defendant's presence unquestionably forbids the use of the deposition at trial. *In re Letters of Request from Supreme Court,* 821 F. Supp. 204, 209 (S.D.N.Y. 1993). The District Court ruled that no one would attend the deposition and obtained no written waiver from the Defendant. The court's failure to comply with the mandates of Rule 15(c)(3) was reversible error irrespective of the violation of Defendant's Confrontation Clause rights.

## C. The Admission of Tenuta's Deposition Testimony Violated Baldwin's Sixth Amendment Confrontation Guarantees.

The government clings to its losing waiver argument, because it cannot defend the admission of Tenuta's Rule 15 deposition testimony at trial. Even if this

Court were to conclude that the Defendant did not adequately assert his right to be physically present at Tenuta's deposition under Rule 15, Defendant did not waive his Sixth Amendment Confrontation guarantees to the *use* of the deposition at trial. Compliance with Rule 15 is necessary when examining the question of whether a witness's testimony may be preserved for trial by deposition, but it does not put to rest the question of whether a deposition is *admissible* at trial. *See Drogoul,* 1 F. 3d at 1554. The defendant's right to confront witnesses "is the most important factor to be taken into account in determining whether to allow the *use* of a deposition at a criminal trial." *Id.* at 1554. (emphasis added) *See also, Warren,* 713 F. Supp. 2d at 4 ("the text and structure of Rule 15 as well as judicial opinion interpreting the rule, distinguish between the *availability* of a deposition and the eventual *admissibility* of the deposition at trial.")

Here, the Defendant repeatedly objected to the use of Tenuta's deposition testimony not only because Defendant was denied a face-to-face encounter with Tenuta, but because he was denied a face-to-face encounter with Tenuta *in the courtroom before the trier of fact* where the jury could see his testimony and observe both Tenuta and the Defendant at the same time. "Courts have long recognized the critical importance of a criminal defendant's 'opportunity to cross-examine and impeach a witness at trial *before the jury* that will decide his innocence or guilt." *United States v. Burden,* 934 F. 3d 675, 685 (D.C. Cir. 2019) The axiomatic right to a witness's live testimony in the courtroom provided the accused an opportunity "not only of testing the recollection and sifting the conscience of the witness, but of

compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether it is worthy of belief." *Mattox v. United States,* 156 U.S. 237, 242-43 (1895).

Before the District Court and on appeal, the government conflates Rule 15 requirements with the demands set forth in *Maryland v. Craig,* 497 U.S. 836, 845 (1990) for the admission of a Rule 15 deposition. Compliance with Rule 15 is not tantamount to compliance with the holding in *Craig*. The District Court failed entirely to examine the government's motion to admit Tenuta's Rule 15 deposition pursuant to *Craig*.

The government attempts to defend the admission of the deposition testimony under *Crawford v. Washington,* 541 U.S. 36, 68 (2004), arguing that because Tenuta was unavailable and Defendant had a prior opportunity to cross-examine Tenuta, no Sixth Amendment violation occurred. The government completely reads out of *Crawford* the Sixth Amendment guarantee that an accused is entitled to a face-to-face encounter with his accuser *before the trier of fact*. While Defendant agrees that a face-to-face confrontation is not an absolute requirement under the Sixth Amendment, the fact "[t]hat the face-to-face confrontation requirement is not absolute does not . . . mean that it may be easily dispensed with." *Mattox,* 156 U.S. at 850.

The United States Supreme Court and this Court have made it clear that a denial of a face-to-face confrontation is only acceptable in very limited

circumstances when there is an important public policy at stake, and the reliability of the testimony is otherwise assured. *Craig,* 497 U.S. at 850. *See also, United States v. Hamilton,* 107 F. 3d 499, 503 (7th Cir. 1997). The government in this case not only failed to satisfy either prong of, it did not even try. The District Court judge also conducted no analysis to determine whether an important public policy interest was at stake and whether the reliability of Tenuta's testimony was otherwise assured.

In its brief on appeal, the government inexplicably cites *United States v. McGowan,* 590 F. 3d 446 (7th Cir. 2009) and *United States v. Cannon,* 539 F. 3d 601 (7th Cir. 2008) but immediately acknowledges, as it must, that in those cases the defendants were physically present in the same room as the witnesses when they were deposed thereby preserving the defendant's right to a face-to-face encounter.

The government next argues without authority that *Craig* does not supply the appropriate test in this case because Tenuta's Rule 15 deposition did not constitute trial testimony, but rather amounted to a pretrial statement that should be examined pursuant to *Crawford.* First and foremost, the Court of Appeals and District Courts, including the Northern District of Illinois, have overwhelmingly applied *Craig* when deciding whether remote two-way CCTV testimony in Rule 15 depositions or during trial comports with Sixth Amendment Confrontation guarantees. *See, e.g., United States v. Abu Ali,* 528 F. 3d 210 (4th Cir. 2007); *Horn v. Quarterman,* 508 F. 3d 306, 319 (5th Cir. 2017); *United States v. Wandahsega,* 924 F. 3d 868, 879 (6th Cir. 2019); *United States v. Bordeaux,* 400 F. 3d 548, 553-54 (8th

Cir. 2005); *United States v. West,* 2010 U.S. Dist. LEXIS 85832, *7-8 (N.D. Ill. 2010);

*United States v. Sapse,* 2011 U.S. Dist. LEXIS 47507, *8 (D. Nev. 2011); *United*

*States v. Sencen,* 2013 U.S. Dist. LEXIS 168705, *4-5 (S.D. Ala. 2013) (Applying

*Craig* to remote two-way CCTV testimony in Rule 15 depositions or during trial.)

*Craig* is unquestionably the appropriate standard for examining the admission of

Rule 15 depositions in lieu of trial testimony.

Second, in seeking a Rule 15 deposition of Tenuta, the government expressly

admitted that the testimony was trial witness testimony – not pretrial statements.

The government's motion expressly sought to preserve and "present *trial witness*

*testimony"* through a deposition. [Dkt. No. 39] (emphasis added) The government

did not move to take a "pretrial statement" from Tenuta for discovery purposes

which would be prohibited in any event. *Drogoul,* 1 F. 3d at 1551. *See also, United*

*States v. Wag-Aero, Inc.,* 888 F. Supp. 101 (W.D. Ill. 1995) (the purpose of

depositions in a criminal case is to preserve evidence, not to afford discovery) Rule

15 is designed to preserve *trial testimony* – not to obtain pretrial statements. The

government's specious argument that Tenuta's Rule 15 deposition testimony is

simply a pretrial statement must be rejected.

Even if examined under *Crawford,* the government's argument is without

merit least of all because Defendant was not afforded a face-to-face encounter with

Tenuta *at any point.* In *Crawford,* the United States Supreme Court observed that

at common law, depositions could be read against an accused *only* if they were

taken in his presence. *Crawford,* 541 U.S. at 49. *Crawford* notes that the

Confrontation clause applies to "witnesses" against the accused, those who "bear testimony" *Id.* at 51. "Testimony," in turn is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* Under *Crawford,* testimonial statements include those statements "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," *Id.* at 52. While *Crawford* did not specifically define "testimonial statements," its analysis leads to the obvious conclusion that a Rule 15 deposition intended to supplant in-court testimony clearly constitute testimonial statements.

The government's reliance on *United States v. Yates,* 438 F. 3d 13017 (11th Cir. 2006) and *United States v. Bordeaux,* 400 F. 3d 548, 554-57 (8th Cir. 2005) is of no help where in both decisions, the courts recognized that *Craig* supplied the proper test for admissibility of witness testimony where a face-to-face encounter is lacking. In *Bordeaux,* the court held that *Criag* controlled two-way systems as well as one-way systems, because *inter alia,* a "confrontation" via a two-way closed-circuit television is not constitutionally equivalent to a face-to-face confrontation. *Id.* at 554. The court observed that virtual "confrontations" fall short of the face-to-face standard because they do not provide the same truth-inducing effect. *Id.* In *Yates,* the court also rejected the government's argument that *Craig* did not apply because two-way video conference testimony was more protective of defendant's confrontation rights than the method of admitting testimony of an unavailable witness prescribed by Rule 15. But the *Yates* court only reached that conclusion

because Rule 15 gives the defendant the right to be present at the deposition and thus an opportunity for physical face-to-face confrontation. *Yates,* 438 F. 3d at 1314.

The procedure used by the District Court here was the worst of all possible scenarios. Tenuta gave testimony from London in a recorded deposition that was more akin to the prohibited one-way closed-circuit television than a two-way video conference because Tenuta could not observe Defendant during the deposition. The court ordered that Defendant, and his lawyers remain in a Chicago courtroom while Tenuta was alone in a London conference room. As the deposition image below reflects, Defendant was not even afforded a virtual confrontation with his accuser, because Tenuta could not see Defendant when he gave the recorded testimony. Tenuta could see the lawyers and the judge, but the Defendant is nothing more than a vague figure in a small box in the background. A face-to-face encounter requires the accused and the accuser to see *each other*. Indeed, it's arguably more important that the accuser see the accused for the purpose of eliciting truthful testimony. "Both common sense and some experimental evidence suggest that emotions of guilt and shame may make it harder to tell a lie that will cause someone else harm when that person is present." Spottswood, Mark, *Truth, Lies, and the Confrontation Clause,* Vol. 89 at 583, Col. L. Rev.

The procedure used here was akin to the one-way closed-circuit television utilized in *Craig* but even worse because it was recorded – not presented live. Tenuta (the accuser) was examined by the attorneys while the judge and the defendant watched on a screen, but Tenuta could not actually see Defendant. Thus,

the jury had no opportunity to see Tenuta testify in real time *and* had no ability to view even a virtual face-to-face encounter between Defendant and Tenuta.



The District Court judge also failed to examine whether the reliability of Tenuta's testimony was otherwise assured – it wasn't. As Defendant's objections to the PSR sets out in detail, Tenuta's testimony was almost certainly filled with false statements. [Dkt. No. 155 at 28-31] Tenuta contrived implausible stories as to explain why the agreements he signed were of no legal consequence and why they did not appear to reflect Michael Steven's signature. Tenuta's testimony was dubious and seemed to suggest he was involved in his own criminal activity to defraud his boss.

The District Court committed a multitude of errors in connection with the admission of Tenuta's deposition testimony. The case of *United States v. Abu Ali,*

528 F. 3d 210 (4th Cir. 2008) is instructive here, notwithstanding that the Fourth Circuit found no Sixth Amendment violation under *Craig*. There, the defendant, an American citizen, was charged with various crimes arising from his affiliation with an al-Qaeda terrorist cell located in Medina, Saudi Arabia. *Abu Ali,* 528 F. 3d at 221. The defendant was arrested in Saudi Arabia and interrogated by the Mabahith (Saudi law enforcement officials). The defendant allegedly confessed to his affiliation with al-Qaeda under Mabahith interrogations. Saudi Arabia subsequently surrendered the defendant to United States authorities where he faced a wide array of terrorist-related charges. *Id.* at 224-25.

Claiming torture, the defendant challenged the voluntariness of his confessions. Over the defendant's objection, the District Court permitted the government to take Rule 15 depositions of Saudi Mabahith officials in Riyadh. *Id.* at 238. The Fourth Circuit observed that the Mabahith officers resided in Saudi Arabia and were outside the jurisdiction of the court. Notwithstanding, the government "officially inquired into whether the Saudi Arabian government would allow the officers to testify at trial in the United States." *Id.* The Saudi government denied the request but permitted the officers to sit for depositions in Riyadh. *Id.*

The Fourth Circuit held that the district court properly concluded that that officials were unavailable and that it was impractical for the defendant to travel to Saudi Arabia for two reasons: (1) it would be difficult for United States Marshals to maintain custody of the Defendant while in Saudi Arabia; and (2) the fact that the

defendant committed his offenses in Saudi Arabia might subject him to prosecution overseas, potentially complicating his return to the United States. *Id.* at 239.

Given these practical difficulties, the trial court attempted to fashion deposition procedures that would best preserve the defendant's Confrontation Clause rights. *Id.* The district court directed that two of the defendant's attorneys attend the deposition in person in Saudi Arabia along with two prosecutors and a translator. *Id.* A live, two-way video link was used to transmit the proceedings to a courtroom in Alexandria, Virginia which allowed the defendant and another one of his attorneys to see and hear the testimony contemporaneously. A court reporter in Alexandria transcribed the testimony and both the witnesses and the defendant were videotaped during the depositions, so that the jury could see their reactions. *Id.* The arrangement allowed the Mabahith officers to see the defendant as they testified, and the videotape presented side-by-side footage of the Mabahith officers testifying and the defendant's simultaneous reactions to the testimony. *Id.* at 242. The trial court presided over the deposition testimony in Alexandria. Defendant was also able to communicate via cell phone with his defense counsel in Saudi Arabia during frequent breaks in the proceedings. *Id.* at 240.

On appeal, the defendant argued that the foregoing arrangement violated his Sixth Amendment confrontation rights. The Fourth Circuit examined the issue by applying the rule under *Craig v. Maryland*. The Fourth Circuit found that although defendant was denied a face-to-face confrontation, the government had demonstrated an "important public policy" justification, namely the security of the

Nation from terrorist activities. The court observed that "no governmental interest is more compelling than the security of the Nation" and that the "government has no more profound responsibility than the protection of Americans, both military and civilian, against additional unprovoked attack." *Id.* at 240. Importantly, the Fourth Circuit noted that *Craig* "plainly requires a public interest more substantial than convicting someone of a criminal offense." *Id.* at 241. But that the government had met the burden under *Craig,* because prosecution of those bent on inflicting mass civilian casualties or assassinating high public official is just the kind of important public interest contemplated by the *Craig* decision. *Id.*

Abu Ali offers a number of lessons that demonstrate that Defendant's Sixth Amendment Confrontation rights were violated in this case. Remarkably, *Abu Ali* was afforded greater Sixth Amendment protections than was the Defendant. First, the District Court in the instant case did not require the government to make any efforts to secure Tenuta's in-court testimony unlike the government attempted to do in *Abu Ali.* The District Court did not put Tenuta under oath or even question his attorney about whether he would appear in person to give testimony.

Second, the District Court in this case did not identify any case-specific rationale for precluding the Defendant from attending Tenuta's deposition in London nor did it explain why Defendant's attorneys could not attend in person as Abu Ali's attorneys were permitted to do.

Third, and most importantly, the Fourth Circuit examined the Sixth Amendment challenge issue under *Craig*, acknowledging that the Rule 15

depositions were only admissible if there existed an important public policy reason that justified a denial of the defendant's face-to-face confrontation rights. In this case, the District Court engaged in no such analysis, and the government did not identify any important public policy reason that permitted the introduction of Tenuta's Rule 15 deposition other than it needed the testimony to convict the Defendant. As the *Abu Ali* court noted, the government's desire to prosecute someone for a crime is not an important public policy rationale that trumps a Defendant's Sixth Amendment Confrontation guarantees.

Of particular note, the District Court in this case fashioned a process for taking Tenuta's Rule 15 deposition that fell far short of the protections offered in *Abu Ali*. As noted, the District Court here not only precluded the Defendant from attending the deposition, which was entirely feasible, he immediately rejected the suggestion that any attorneys would be present, leaving Tenuta alone in a conference room with no eyes on him. Most troubling, the two-way video set-up did not allow Tenuta and Defendant to have even a virtual confrontation as did the Abu-Ali and the witnesses in his case. Tenuta did not have to face Defendant when he testified. Relatedly, the jury in this case was never able to see the Defendant's reactions to Tenuta's testimony.

*Abu Ali* is precisely the type of exceptional case where the denial of a face-to-face encounter is superseded by important public policy concerns. This case is a run-of-the-mill conspiracy to commit wire fraud case. No public policy justification existed that permitted the District Court to preclude the Defendant from attending

the deposition or admitting the Rule 15 deposition at trial. Accordingly, Defendant's Sixth Amendment Confrontation rights were violated when the District Court admitted Tenuta's Rule 15 deposition without considering whether any important public policy reason justified its admission.

### D. Defendant's Objections Are Preserved and Would Constitute Plain Error in Any Event.

The government contends that even if the Defendant did not affirmatively waive his Sixth Amendment Confrontation Clause rights, the issue was forfeited and not subject to plain error. (Gov. Br. 32) The government further insists that the error was not "clear or uncontroverted" at the time of appeal. Both arguments are without merit. Federal Rules of Criminal Procedure 52(b) states that "a plain error that affects substantial rights may be considered even though it was not brought to the court's attention." In such cases, the reviewing appellate court may correct an error committed by the district court provided that the error is "plain" and that it "affects substantial rights." *United States v. Olano,* 507 U.S. 725, 731 (1993).

Defendant vehemently maintains that the errors at issue here were brought to the court's attention and properly preserved as the District Court Judge noted on several occasions. Even if they were not, the admission of Tenuta's deposition without affording him a face-to-face encounter with his accuser and without conducting any analysis under *Craig* is both plain and affected Defendant's substantial rights. The error is also plain and uncontroverted where the United States Supreme Court has held for decades, and this Court has acknowledged for decades, that a Defendant has the right to a physical face-to-face encounter with his

accuser. The District Court seemed to understand this fundamental principle, it just failed to honor it.

###### E. The Error Was Not Harmless Beyond a Reasonable Doubt.

The government argues that any Confrontation Clause error was harmless because no "miscarriage of justice" occurred. The government bears the burden of proving that the error was harmless beyond a reasonable doubt. Courts assess this issue by considering "the importance of the witness testimony in the prosecution's case, whether the testimony cumulative, and, of course, the overall strength of the prosecution's case." *Del v. Van Arsdall,* 475 U.S. 673, 684 (1986). *See also, United States v. Carter,* 907 F. 3d 1199, 1209 (9th Cir. 2018). The "assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation;" rather, harmlessness must "be determined on the basis of the remaining evidence." *Coy v. Iowa,* 487 U.S. 1012, 1021-22 (1988).

The government has not carried its burden in showing that the Confrontation Clause error was harmless beyond a reasonable doubt. Tenuta provided the sole evidence related to the Futura counts of the indictment (Counts Six and Eight). As the record reflects, no other witness testified about Defendant's alleged fraud related to Counts Six and Eight other than Tenuta, and the documents presented to the jury were not dispositive of anything. Indeed, they did not actually corroborate Tenuta's dubious testimony in large measure. Tenuta's testimony was highly suspect as it suggested his own unethical, perhaps criminal, culpability that

resulted in the loss of his job. Indeed, it seems probable that Tenuta's reluctance to coming to testify was motivated by his fair of criminal prosecution. The government conceded in its Rule 15 motion and at argument that Counts Six and Eight hinged on Tenuta's testimony and that without it, it would be unable to prove its case. The government's case was not strong as to Counts Six and Eight and turned entirely on Tenuta's testimony. As such, the error was not harmless beyond a reasonable doubt.

In sum, Baldwin's Sixth Amendment Confrontation rights were denied when he was denied a physical, face-to-face encounter with Tenuta at his trial or at his deposition, and the government identified no public policy basis for dispensing with that all-important right. Accordingly, he is entitled to a new trial on all counts but at the very least on those Counts that turned on Tenuta's testimony.

## II. The Wire Fraud Counts of Baldwin's Indictment Were Not Properly Joined Pursuant to Fed. R. Crim. P. 8(a) and the District Court Abused Its Discretion When It Denied Baldwin's Motion to Sever Pursuant to Fed. R. Crim. P. 14.

The government insists that the charges against Defendant were properly joined as they were part of a single common scheme. In support of its contention, the government relies on *United States v. O'Brien,* 953 F. 3d 449 (7th Cir. 2020) in which this Court observed that schemes to defraud are often multi-faceted and that a defendant may employ various means when committing the offense.

Defendant does not quarrel with this proposition, but unlike *O'Brien,* the government here did not plead or prove any common scheme. Instead, the

government pled and presented evidence of a hodge-podge of different schemes that occurred over the course of more than a decade, and which had no commonality other than Defendant's alleged desire to misappropriate funds from a wide array of individuals with little connection to each other.

*O'Brien* is instructive in demonstrating why misjoinder occurred in this case. In *O'Brien,* the indictment clearly alleged a single scheme to defraud lenders in four related transactions during a three-year time frame. *Id.* at 453. Specifically, the defendant was charged with mail fraud and bank fraud stemming from her misrepresentations about her income and liabilities that caused lenders to refinance loans related two investment properties. The scheme was clearly a single common scheme and involved overlapping evidence where: (1) the defendant fraudulently obtained mortgage loans to purchase one property through misrepresentations of her income; (2) refinanced that *same* property a year later again misrepresenting her income; (3) fraudulently obtained a commercial line of credit to maintain that *same* property; and then (4) sold that same property (along with another property) to straw buyers who submitted false information to lenders. *Id.* at 453. *O'Brien* provides a text-book example of how different offenses can share a logical connection and arise from a single scheme.

Similarly in *United States v. Prieto,* 812 F. 3d 6 (1st Cir. 2016), another case relied on by the government, the defendant was charged with numerous offenses *all* of which stemmed from his fraudulent "mortgage rescue program" over a three-year period. In *Prieto,* the defendant repeatedly used the same methods to carry out his

over-arching scheme which was to defraud lenders (and homeowners). While it involved numerous different lenders and homeowners, the counts were linked logically and involved overlapping evidence. *Prieto* is another classic example of a common scheme involving discrete offenses. Thus, joining these offenses in a single indictment was entirely appropriate.

In contrast, here Defendant was charged with various financial crimes over a long period of time that had no common thread other than the Defendant's alleged motive to steal from people. The "scheme" was neither systematic nor integrated; it did not target a specific type of investor or creditor; and the transactions bore little resemblance to one another. The government's indictment made disparate charges look similar for the purpose of conducting a single trial that would allow it to swamp the jury with bad conduct and prejudice the Defendant in a way that made it impossible to defend the case.

The government does not attempt to defend the District Court's denial of Defendant's motion to sever. Instead, the government simply argues that Defendant waived his severance challenge because he failed to renew the motion at the close of evidence. As the District Court's Pretrial Order reveals, it would have been an act in futility for Defendant to have renewed his motion for severance at the close of evidence. The suggestion that the District Court judge would have conceivably granted a motion to sever after the close of the case is frankly absurd.

**III. Baldwin Was Denied a Fair Trial Where the Court Allowed the Introduction of Excessive Other Bad Act That Constituted Impermissible Propensity Evidence and Should Have Been Excluded Under Fed. R. Evid. 403 In Any Event.**

As discussed in Defendant's opening brief, the District Court sanctioned the government's introduction of a bevy of other bad act evidence allegedly committed by the Defendant over the course of a decade. In addition to evidence related to the charged offenses, the government offered evidence related to nine other alleged victims, extensive evidence of disciplinary sanctions by financial regulating bodies, and an agent who referenced even *more* alleged victims who never testified. The government insists that it was entitled to swamp the jury with a mountain of bad act evidence because it was all relevant to Defendant's "scheme" even conduct that pre-dated and post-dated the charged offenses.

As discussed above, the government failed to show an overarching scheme that permitted it to introduce testimony from Clark Delanois, Kelly Gray, Gail Grabczynski, Dr. Twana Edwards, Emily Rillo, and Currency Click Investors, Mssrs. Miller, Bell, Van Horn, Sault, and Reigel without conducting an appropriate Rule 404(b) and Rule 403 analysis. As the government acknowledges, a "scheme to defraud" is a "[a] systemic plan; a connected or orderly arrangement, esp[ecially] of related concepts" and an "[a]rtful plot or plan, usu[ally] to deceive others." *United States v. Chanu,* 40 F. 4th 528, 540 (7th Cir. 2022). The government fell far short of showing that Defendant engaged in a "systemic plan," "orderly arrangement," or

"artful plot" to carry out a scheme. Accepting the government witnesses' testimony as true (for argument's sake), the government did little more than show that Defendant was a disorderly conman who engaged in unethical business practices. There was nothing systemic, orderly, or artful about Defendant's alleged scheme, even accepting the government's evidence as true.

The government's introduction of testimony of ten witnesses (AOB Statement of Facts a pgs. 10-11), most of whom testified regarding events that occurred years before the charged conduct was introduced solely to overpersuade the jury that Defendant had committed the charged wire fraud counts. The jury was implicitly and expressly told that it should find Defendant guilty of the charged offenses because he had engaged in similar type of conduct dating back to 2006, long before the charged offenses. The evidence was introduced for a prohibited purpose, namely, to prove that Baldwin had a history of committing fraud in the past and therefore committed fraud in connection with the charged conduct.

But even *if* the uncharged evidence was relevant to show some type of scheme, it was incredibly cumulative and prejudicial such that Defendant had no chance of presenting a defense on the charged offenses. The trial was nothing more than trial of Defendant's character and overall indictment of his business dealings. Accordingly, Defendant is entitled to a new trial.

IV.    **The Trial Court Erred When It Denied Defendant's Motion for a**
       **Mistrial on the Grounds that Agent Paniwozik Gave Unreliable and**
       **Misleading Financial Analysis.**

The government concedes, as it must, that Paniwozik did *not* conduct a complete analysis of every account associated with the Defendant when he conducted his forensic analysis. Where Defendant produced partial account statements in the middle of trial that were not reflected in the summary reports prepared by Paniwozik, the record on its face demonstrates that Baldwin had additional trading, business, and personal accounts that were not considered by Paniwozik in his analysis. Admittedly, defense counsel conceded that Paniwozik did not *intentionally* give false testimony, but defense counsel maintained that the testimony was misleading.

As Defendant argued on appeal, the government should have known that Paniwozik's testimony was misleading when he told the jury that he had conducted a financial analysis of Baldwin's "accounts." (R1251) The testimony was not conditional and unquestionably left the jury with the false impression that the forensic analysis involved a comprehensive and complete review of all of Baldwin's accounts.

Even if this Court concludes that Defendant was not entitled to a mistrial based on Paniwozik's misleading testimony, this matter should be remanded for a hearing to further develop the record. Defendant should be afforded the opportunity

to amplify the record on appeal with missing bank statements that either the government knew about or that trial counsel should have obtained.

## V. Defendant Is Entitled to a New Sentencing Hearing Where the District Court Miscalculated the Total Offense Level Based on Inflated Loss Amount.

Where the government offered no compelling response to Defendant's sentencing argument, Defendant relies on his opening brief.

## CONCLUSION

For the foregoing reasons, Defendant's convictions must be reversed and the matter remanded for a new trial. Minimally, Baldwin is entitled to a hearing on his claim related to the misleading testimony of Agent Paniwozik, and a new sentencing hearing.

Respectfully Submitted,

/s/JENNIFER BONJEAN

JENNIFER BONJEAN
BONJEAN LAW GROUP, PLLC
303 Van Brunt Street
Brooklyn, NY 11231
(718) 875-1850

Chicago Office:
BONJEAN LAW GROUP, PLLC
53 W. Jackson, Blvd. Ste. 315
Chicago Illinois 60604

*Attorney for Defendant-Appellant*

## CERIFICATE OF SERVICE

The undersigned hereby certifies that on September 3, 2024, the foregoing

Reply Brief of Defendant-Appellant Shawn Baldwin was filed using the Court's

CM/ECF system as an Exhibit to Defendant-Appellant's Motion for Leave to File an

Oversized Reply. All participants in the case are registered CM/ECF users and will

be served electronically via that system.

Dated: September 3, 2024                    Respectfully Submitted,

                                            /s/ JENNIFER BONJEAN
                                            Bonjean Law Group, PLLC.
                                            303 Van Brunt Street
                                            Brooklyn, NY 11231
                                            (718) 875-1850

                                            Chicago Office:
                                            BONJEAN LAW GROUP, PLLC
                                            53 W. Jackson, Blvd. Ste. 315
                                            Chicago Illinois 60604